Ms. Watson, will you call our first case, please? 18-0941, John P. Foley v. Builtech Construction, Inc. All right, will the lawyers on Foley v. Builtech please approach? And tell us who you are, who you represent. Thank you. My name is Stephen Berman, T-E-R-M-A-N, and I represent the plaintiff and the appellants, John Foley. All right. Michael Sanders, and I represent the defendant at William Builtech. All right. And Mr. Berman, how much time would you like? I think 20 minutes would be fine. Okay, and a couple minutes for rebuttal in that 20 minutes? Five minutes. All right. Yes. Okay. And Mr. Sanders? 20 minutes. Okay. One minute. All right. And whenever you're ready. Thank you. May it please the Court, Your Honors. As I said, I represent John Foley, who is an ironworker who was injured on May 21, 2015, when he was exposed to an unsafe condition on a construction site that had been present for at least six days. He was employed by a subcontractor by the name of Chicago Town Construction. But this case is against the general contract. I think we know the fact. So the question has to do with Restatement 414. That's the crux of it. And under the Carney case, there has to be some control, and it can't be just general control. It's got to be specific. And the first thing you look at is the contract. Yes. So what specific things in the contract are you saying that bring it into the specific rather than the general, so that there's factual issues? Sure. We can start with the contract, absolutely, because the case law, as you pointed out, that's where we begin. That's where we begin the analysis. And in this case, we begin the analysis with the general contract that BILTEC agreed to perform certain services. In that general contract,  With the owner. Correct, Your Honor. BILTEC agreed to perform certain services and be paid for those services, including And every contract that a general has with the owner imposes on the general the obligation for all the means and methods for all the trades that are going to be on the site, for compliance with safety, for every single contract does that. And then the general turns around and enters into subcontracts with the trades and says, You're responsible for the work you're going to do as the concrete or the iron work or the carpentry or whatever, and you're responsible for the safety of your employees on the site. Isn't that what these contracts said? Respectfully, no, Your Honor. That's not what these contracts say. And I would just back up. As to the premise of the question, just want to be on the record, I don't agree with the premise. And that is, although I understand the case law, Fonseca and Lopret are clear that the contract between the owner and the general contractor, such as the one in this context, appear to be a general right, as Your Honor pointed out. However, in this case, we have well more than those two cases had, and that's the subcontract. In our subcontract, we have a clear and definitive retention of the right of control. And in the subcontract, it's clear that the general contractor says to the subcontractor, the subcontractor, quote, shall comply with all decisions of the contractor relative to safety, end quote. That's right in the subcontract agreement that the subcontractor agreed to. Furthermore, in the subcontract agreement, which is not in any of those other cases that we're discussing, it says, quote, in order to provide safety controls, the subcontractor will take such additional measures as the contractor may determine to be reasonably necessary. And so I understand that's the provisions of the subcontract. Mm-hmm. So each sub has its own employees on site doing their part of the work. Yes. And the general says, you've got to comply with my safety manual, 500 pages. You've got to comply with it. Right? Mm-hmm. So does that impose on the general the obligation to physically eyeball every employee on the site to make sure they're lifting properly? It requires under the law of the general contractor to exercise reasonable care. Reasonable care. Now, what is reasonable care? I would argue that that is what the jury decides. So in other words, does the general contractor require to look over the shoulder of every contractor to see what they're doing at their day-to-day job and to see if it's safe or unsafe or if the conditions are safe or unsafe? I don't know. I think that's up to the jury to decide that. That would mean every construction site injury case goes to the jury. Well, I don't think so. Not necessarily. Sure. Because if the retention of control over safety, which every general does, is enough to say were they reasonable when they exercised their control, that would be a question of fact in every case. Well, I believe, Your Honor, reasonableness is a question of fact. However, there are certain cases, and the record is complete with them, where reasonableness is not a question of fact. Where there is no question that the contractor had no ability to ever see the unsafe condition or be aware of it, and therefore, their conduct could not be unreasonable. But the 414 presupposes that if safety is the area of control, there has to be notice to the general, notice to the owner of the unsafe condition. So where is that evidence? Well, there's the evidence. This case is complete with evidence of that. There's evidence that before you get to it, are you saying that you agree with that premise, that you have to have notice, or is it no or should have known? I would argue technically I do not agree with that premise. However, there is the 414 that says should have known of the unsafe condition, thus had the ability to prevent it. So reasonable care ultimately relates to the ability to prevent the unsafe condition or unsafe act. The ability to prevent relates to the issue of notice. So reasonable, a general contractor will not be considered to have acted unreasonably or lacked reasonable care if they had no notice of the condition or should not have known of it. They had no reason to know of it. And there are cases that relate to that. So BOCAR says I walk the site every day. Yes.  I saw the pile of rebar. I didn't see anything unsafe about it. Nobody told me there was anything unsafe about it. So where's the notice? Well, there's a couple of reasons. Number one, he had actual notice, I would argue. There is evidence in this case that the superintendent had actual notice of the unsafe condition. What is that evidence? The evidence is just by the pictures themselves. Are the originals of the pictures in the record? Yes. In the record? Yes. Are they? I have them. The black and white ones are in the electronic record. Did you file the original pictures with the court? Yes. Okay. Which I do have with me right here, actually. And I can have a slate of the exact pages in the record. Pages C, 627. I've seen those pages in the record. They're black and white. Did you file those color pictures that you're holding in front of you with the court? These were from the record. I printed these out. Yes. The electronic record has black and white versions of those. They are not colored. There is no capacity in this court to reproduce color pictures. This is page C, 627. No, no. I know it is. No, no. The question, yes. I don't think you're communicating on the question. The question is, did you separately file a color copy with the court? I mean, you made a copy. But that's the question. These are in the record in color. So they are. What we have is black and white. They're not. All I can say is I printed them out from the record. I'm just telling you they're not. I have examined the electronic record. They are black and white in the electronic record. Okay. I would suggest to just double check pages 627, 628. I printed some last night. They are black and white. These pictures that are produced. If you want us to look at color photographs, you have to provide them. Okay. And let's be fair. We think that a rule has been proposed here that if there are color pictures produced in court and introduced into the court, that it's the attorney's burden to make sure that those same color pictures get to us. But I must tell you that I can't verify that this minute. So in a way, I don't want to sandbag you and say, oh, you should have filed those color pictures, because there may actually not be a rule that you do that, and so you may not have been aware of that. But the fact is what we have seen is not color pictures. What you introduced in court was color pictures, but the electronic file that the clerk sent us did not come out on our end as reproductions of color pictures. So we can clarify that. But I just wanted to – I think I would be hesitant to sandbag you with this color picture issue unless we can document, which we can't right now, that there's a rule that you should have known about. And I'm sorry about that, Your Honor. All I can say is what I printed out from the record that was transmitted to me. We get that. Well, that's all I know. And I'll bet you we have a color printer. I do have a color printer. And there's not one single color printer in this courthouse. And the electronic record shows up in black and white. That's all I'm telling you. That may not be your fault, because we may not actually have a general rule that says you have to provide a supplemental record with the color pictures. But right now what we're telling you is you can't argue about color pictures because we've never seen color pictures. So that's an issue for you that you're going to have to overcome. I have a different question. My colleague has pointed out that, you know, every case would go to a jury. Frankly, I'm not sure that that's a bad result. But on the other hand, I don't think that every case would go to a jury. My real question is, what's the point of being a general contractor responsible for what's going on on the work site if you're going to be able to say, oh, it's not my job, it's not my job, it's not my job to worry about safety? Well, that's the ultimate concern we have, is when we look at the general contractor, Your Honor, the general contractor does in its contract accept certain responsibilities that it argues that it promises to be responsible for and gets paid to perform. And it shouldn't be allowed to jerk its duties by hiring a subcontractor who's going to do certain work. And, in fact, this contract said that the subcontractors had to comply with the contractor's safety requirements. So then doesn't that actually and constructively demonstrate that the contractor is taking the responsibility to make sure that the subcontractor is doing that? Yes, Your Honor. And also in the evidence, the superintendent whose responsibility is to supervise you. The safety superintendent. The general contractor superintendent who's on site every day for the project, Mr. Volcker, who is responsible for site safety, actually testifies that it is his responsibility daily to not only inspect for safety conditions and activities, but also. Without talking about color pictures, black and white pictures, I got the feeling that the rebar on the top was stacked correctly and it was the rebar on the bottom that was a mess. And that even if you looked at this stack of rebar, you wouldn't have necessarily known that the bottom was a mess. So is there any testimony that he told the safety inspector, the general contractor's employee that this rebar on the bottom is a mess? There's no testimony that the general contractor's employee was directly told that. But there is testimony by the plaintiff himself that the pile of rebar that was a tangled mess, the pile itself was an unsafe condition. And the plaintiff specifically testified that that unsafe condition was present on the job site before he arrived on the site on May 21st. He specifically testified. It wasn't hidden. It wasn't obscured by anything. It wasn't. It wasn't obscured. Underneath the pile of rebar that was okay. It wasn't. And unfortunately. Blocked from view by a truck or anything like that. Absolutely not. We're not talking about pictures. Okay. I have a testimony. Let's talk about testimony. What Mr. Foley testified to was that at the time of his injury, he was trying to get at other bars that were hidden underneath. That's what he said. Right. Because they're a tangled mess. If they're hidden, he didn't know about them. Nobody else told Bill Teck about them. Your Honor, the unsafe condition is not one individual piece of rebar that he's trying to pull out. I know that. It is a tangled mess of rebar. And, again, it's shown by the pictures. But we don't want to talk about the pictures that Mr. Bokar himself personally took. This particular pile that's tangled and it's a mess. And it's not properly stored. And Mr. Bokar specifically testified he knows the proper and safe way to store rebar. It's on a flat surface with cribbing underneath, separating the pieces. This is not that way. This was done in a mess. All the bars were put together. And that is the unsafe condition. So let's say Mr. Bokar walked the site the day before. He saw what you characterize as a tangled mess of rebar. What would he do? Well, he testified to that exact point. He said his testimony was specifically that he would talk to Chicago Town and direct them and force them to re-stack the rebar. Tell them to re-stack it. Did he say he would stand there while they re-stacked it to make sure they did it correctly? No, he didn't say that. Okay, so if he tells Chicago Town they've got to re-stack this rebar and Foley's the guy who shows up the next morning, what's he going to do? Re-stack the rebar, right? Chicago Town will comply with Mr. Bokar's direction. He's the iron worker for me. He is. Right. So he shows up the next morning. Biltec, the general, has said you've got to re-stack this rebar before you can start doing the foundation work. He's going to re-stack the rebar, right? He has to. He has to. He has to comply with the direction. He has to. So he starts moving the ones he moved, right? He moves 20 of them. He gets to the tangled mess. What's he going to do? Your Honor, the tangled mess was already present. The tangled mess is not underneath a bunch of pieces of rebar. He testified it was. He said it was hidden underneath. He did not, Your Honor. If you really, if we carefully look at the testimony, what he actually testified to was the piece that he was trying to get at was hidden underneath. Why? Because it was a jumbled mess, because he's looking for particular sizes and lengths of rebar that are not stacked properly. Mr. Foley and Mr. Bokar testified that the proper way to stack the rebar is to put them in separate bundles on cribbing so he doesn't have to search for a specific piece of rebar. He doesn't have to pull. Who stacked it? Who stacked it? Chicago Town? Chicago Town did that. And the day that they stacked it must have been a day before this tangled mess was found. Well, it was at least six days before. So when it was being stacked, did the general contractor have any responsibility to say, you guys stacked that correctly to start with so there's no problems? Well, Mr. Bokar admitted he did have that responsibility, actually. He said that if there's any tangled rebar that Mr. Bokar specifically said would be an unsafe condition on the job site because it would relate specifically to means and measures. I'm talking about like the day it was delivered. A big truck pulls up, a bunch of rebar on it. Somebody offloads it. And the general contractor says to someone, hey, get that off that truck. We've got to get the truck out of here. Whose job is it to make sure that the rebar gets off the truck and stacked safely? I would guess it's Chicago Town's job to take the rebar off the truck. Is it the general contractor's responsibility to say to those guys, and make sure you do it right? It's the subcontractor's responsibility to do the physical labor, and the general contractor's responsibility, admitted responsibility, to make sure it's done correctly and safely. And if it's not done safely and he sees that, his job is to do the rest. That's the part, though, that he sees that. Tell me where that evidence is that anybody from BILTEC saw that before May 21st. Well, we know that Mr. Bokar testified that he was responsible or in part responsible for having the material move from a safe location to an unsafe location. No, it was moved because there was going to be excavation. Right. Not because it was unsafe. They delivered it, put it on one part of the property. There was going to be excavation work that they had to move it for, so they said because the excavators are coming in, you've got to move that rebar. You are correct, Mr. Bokar. It wasn't because it was unsafe or safe. It was because they needed to move it. Unsafe didn't occur yet because it was offloaded safely and under safe conditions before Mr. Bokar made the decision, hey, we've got to get this pile moved because we have some excavation coming in. So Chicago Town moved that pile, moved it over there. And so Chicago Town followed that direction and instruction, which is why this is not a general right. It's a specific right of control. The general contractor controlled where the rebar was placed and how it was placed. And so then it was then Mr. Bokar's job at some point to say, okay, I've got to go inspect how you moved the rebar and make sure you did it properly. Yes. What is that in the contract? Well, it doesn't say that specifically in the contract, but Mr. Bokar admitted, number one, he is the superintendent who superintends the site. According to the contracts, as a superintendent, he represents the defendant, the contractor. So he admitted, he made admissions in the record, that his responsibility is to inspect the site daily, not only in the morning, which is a morning walk-through, but throughout the day for unsafe conditions or unsafe work activities. So he admitted it was his responsibility to make that inspection. Right. That's an admission in the record. Tell me where the evidence is that he knew or should have known of this condition you say caused your client's injury. Well, a reasonable jury could certainly conclude that he knew because he required the Chicago Town to move the rebar into a new location. So certainly he could have seen it on that day. And then for the six days subsequent to that until the day of the occurrence, Mr. Bokar states he's not only on the job site on a daily basis, he's inspecting the site on a daily basis. His job is to look for potential unsafe conditions that could injure workers. He says that he's aware that a tangled mess of rebar would be an unsafe condition and that he saw that he should have done something about it. Now, a reasonable jury could conclude that he certainly should have known about it. He testified that it wasn't a very large job site and he was very familiar with the site itself. He's on the site exclusively. He's superintending the site himself on a daily basis. So let me pose a little different hypothetical for you because the safety manual says you shouldn't try and lift anything heavy while you're standing on a wet surface. Right. Or bending. Correct. It might slip. So it rained the night before when Mr. Foley shows up and he knows the excavators are coming. He's got to get the rebar out, put it in the forms, tie it together, and he's standing on a wet surface, just like the safety manual says he shouldn't, and he slips and falls. Is that BILTEC's problem? Well, that would be a question of what the BILTEC asked for reasons. In your view, it would be a question of facts. I wouldn't. Should they have known? Should they have gone out there and stopped him? I would argue in that hypothetical that any reasonable jury could conclude that BILTEC would know the conditions are potentially slippery and should have done some inspection of the work site and had a meeting with the contractors to determine whether the work practices were going to be done safely or not. We needed to tell Mr. Foley that it rained last night and that concrete or whatever he's standing on might be slippery. That's BILTEC's. That can be a basis for imposing liability on the general. Well, I wouldn't agree that the general contractor has to tell a subcontractor that the site conditions are slippery. However, what you're saying is if it's slippery, it's their job to go out there and inspect and say, don't lift. This is a slippery surface. If it's an unsafe condition and the general contractor has the obligation to prevent work from being done in a dangerous manner. That's what 414 says. And this would be very similar to a general contractor saying to any subcontractor, hey, listen, this is happening today. There's going to be some different kind of truck here, so don't work in this area. Or something else is happening with the electrical work, so don't be installing a fire system here because the electricians are going to be pulling wire. General contractors are supposed to do that. They're supposed to say to the subcontractors, here's what you can do today, or in the alternative, don't do that today because of blah, blah, blah. So if it rained and one of the rules is you're not supposed to be moving rebar when it's slippery, the general contractor could be, it is a question of fact, whether the general contractor should have said to the people who are moving the rebar, you know, we know we have to get this done. We know we have to get it done today, but let's see if we can't figure out some way to do it that's not going to cause an unsafe condition. I agree, Your Honor, and subcontractors are always going to physically perform the labor. That's why subcontractors are hired, to physically perform the labor. But general contractors are there for a reason, too. They're performing a service. That service is safety and inspection and supervision of the work. So although subcontractors are always supposed to do their work in a workmanlike manner, in a safe manner, if they don't because they're there to do a job and sometimes they just work, sometimes they'll work in the unsafe conditions. Sometimes they'll work in the slippery conditions. That's where the superintendent's control comes into play. Right, and so that makes the superintendent and thus the general the insurer of the safety of the workplace. Absolutely. Everything. Every worker, every potential safety hazard. If somebody doesn't follow the safety manual, they're strictly liable. I completely disagree, and it's interesting that the current case does talk about it. They mention, well, this is considering if just because they have a safety manual, does that mean they're in strict liability for any injury that occurs? And the answer is absolutely no. There's no strict liability. The restatement says they have to exercise their control with reasonable care, not strict liability. Right, and in that case, that question has to be decided by a jury in every case. That's what I hear you saying. Well, reasonable care is customarily a jury question. It's a fact-specific question. What did the general contractor do or did not do in this specific case to exercise their control? Duty, breach of duty, approximate cause are all generally questions of fact, which doesn't say in any particular case that summary judgment is inappropriate. Oh, no. Summary judgment can be appropriate if there is no evidence at all in the record. And this is at summary judgment stage. And all facts and inferences should be taken in the light most favorable to the plaintiff. If there are no facts or potential inferences, then a general contractor could ever have discovered the condition and therefore couldn't possibly have failed to exercise their control. Is that the standard, they couldn't possibly have discovered the unsafe condition? Or is it the reasonable, knew or should have known? I think that's where we get to should have known. Should they have known? If they're exercising their ordinary care, if they're exercising care on the job site, should they have known of the unsafe conditions? And that's because Bochar is there and Rebick is there, the safety guy is there, and they're looking and it's been sitting there several days and they had reason. And that's a question for the jury to decide, isn't it? That's a question for the jury to decide. A jury can look at this case and say, look, Bochar is there every day for six straight days. He's aware the pile has been moved. He knows it's been moved by hand, not by a machine. He has the ability to see what's in the pictures, that it's not, there's no cribbing underneath it. It's not on flat ground. It's tangled. You're saying that the pictures are important because they show the condition of the stack. Well, the pictures do show it. No, I understand. That's correct. So those pictures are important to show what the condition was and that he should have known that condition. Well, they're important along with the testimony. I mean, I think the testimony states exactly what the picture shows. So the testimony is what it is. The testimony by the plaintiff is absolutely clear that the stack that he's shown in that picture, Exhibit 5 in his deposition, is a tangled mess. He's asked, is that unsafe? Is there an unsafe condition there?  That's his testimony. So in terms of the plaintiff's testimony, it's a tangled mess and it's unsafe. Why? Because it makes him bend and pull and yank the rebar in a way that he shouldn't have had to do and wouldn't have needed to do. And Bochar, the superintendent, admits that he's aware of that. He knows that a tangled mess of rebar is unsafe. Why? Because it affects material handling, means and methods. The means and methods that are specifically dealt with in the safety manual that Bochar has the duty to enforce. But that gets back to my question. If instead of pulling out rebar for the foundation that morning, Foley was reorganizing the rebar pursuant to Biltek's direction, because Biltek said that's not the right way to stack rebar, what would he have been doing differently? Well, number one, I think that's a good question. In fact, I can answer that question. I think the answer to that question is that instead of looking for the specific piece of rebar he needed to do his work and to bring it over to the worksite to put into the hole and to tie it together, he would be now just taking one piece of rebar off at a time, putting it into a different pile, and completely changing the pile. He wouldn't need to find the right rebar and grab that and pull it. And Mr. Foley says the reason why it's so hard to pull it off, this tangled mess, is because these pieces of rebar have ridges, and they kind of lock together when they're in such a mess. That's why they shouldn't be tangled up like that. That's why they should be stacked safely. And Bocart knows that. Bocart testified about that. So for him to give a blind eye to this tangled mess of rebar and say, well, nobody told me it was unsafe, therefore, there's nothing I did wrong, is like saying that a driver who doesn't see the red light, well, I didn't see it, so I have a duty to stop. And that can't be the rule. That can't be the rule in this type, in this case. That can't be the rule in this factual situation. The general contractor, when they agree to perform safety, they agree to inspect. Let me try to understand your position. Safety manual says you've got to wear safety vests and hard hats. Okay? When the safety supervisor from BILTEC shows up in the morning, everybody's got hard hats and safety vests on. He leaves. A few of those workers take them off. Somebody gets hit on the head with a piece of rebar and he's injured. Is it BILTEC's problem? That's a great question for a specific factual question. However, the question becomes. Is that BILTEC's problem? I don't know because it depends on whether he should have known that that subcontractor took off his hard hat or should that general contractor have known that these workers always take off their hard hats. And if he knows they always take off their hard hats, then he should know to have more supervision on that site. Or if he couldn't have possibly known because between the time the guy took off his hard hat and the time of the incident was 30 seconds, and during that 30 seconds. Let's say it was three hours. He came in the morning, surveyed the work site. Everything looked safe. He goes back to his office across the street where he spends a lot of time because he's coordinating all the other aspects of the project. And in those three hours, people take off their, he's not around, people take off their hard hats and safety vests and somebody gets injured. That's got to go to a jury? Yes, Your Honor, definitely. Because that is a question then for a jury to decide, did this particular general contractor supervise the work with reasonable care? Did they control the work with reasonable care? Is it reasonable for that general contractor to be out in the, out in the field for three hours straight not paying any attention to the work that's being done and allowing this work to be done? Okay, give me a case that says that. It says the safety supervisor got to come through regularly all day long. Give me a case that says that. There's no case that delineates that. There is one. That's a question of fact. Exactly. That is a question of fact for the jury to determine. Did that particular general contractor in your hypothetical exercise reasonable care? There's another question to that, and that is whether the general had retained supervisory control. So first, before you even get to the question you're responding to, you'd have to show us, as you say you've done here, supervisory control by Delta. Correct. Without that supervisory control, it doesn't matter. Well, of course, absolutely. I mean, in every case that relates to 414, the first question is, did the general contractor retain supervisory control? And what that means is control over any part of the work. That's a minimal amount. So if you can show that, then you go to the next question. Yes. And then you may have a question of fact. The second question relates to breach of that duty. Right. And the breach is, did they exercise their or did they fail to exercise their control of reasonable care? That's B. That's comment B of the restatement. But comment A of the restatement talks about, what is the duty itself? And that is not to control every little operative detail of the work, because that's agency law. That's not 414 law. And you're not arguing that Chicago Town was built sex agent? I did at the trial court level. I have not here. You said it in your brief, but you're not pursuing it here, right? At all times I've argued, and I maintain that position. This is vicarious liability. It's not direct agency. I would argue that in this context, given the extent of control over not only where the rebar was placed, but how the rebar was placed, not only the material handling of how the rebar was lifted and moved, that they had control. And it's in the record that the defendant admits they had control over certain means and methods and details of the work. Are you saying that Chicago Town was built sex agent? That agency law could also provide a basis for liability? Yes, I'm contending that. Where is that argument in your brief? I did not argue that in the brief. So vicarious liability is not argued in your brief? I didn't argue that in the brief. I argued that at the trial court level as well. It's not argued in your brief. Thank you. That's all I'm saying. You asked if I contended that. I have always contended that. But in this case, I have contended that supervisory control is clearly proved, because in this case, Chicago Town, not only in their contracts and subcontract and their admissions, they admitted that they had the power to forbid the work from being done in a manner likely to be dangerous. That's comment A. And comment C says that they couldn't just be, it's, control is not just the ability to make suggestions that don't need to be followed or to generally stop and start work, but it's control that relates to the subcontractors not entirely free to do the work in their own way. And the record is replete with information that says the general contractor is required if a subcontractor I'm going to ask you to wrap up. Mr. Berman, we've let you go over. Absolutely. I'll just wrap up with this point, my direct argument, and that is that clearly the evidence is and the admission of the record is that Chicago Town was not free to disregard an order that was given by the general contractor pursuant to the subcontract itself is right in there and pursuant to the admissions and the testimony by Mr. Boeckert and Mr. Chapman and Mr. Foley as well. Therefore, their control has been proved. Whether that control was exercised with reasonable care is a jury question, a fact question. Therefore, some adjustment should have been denied and should be reversed in this situation. Thank you. Thank you. Thank you. Mr. Sanders. May it please the Court? Again, my name is Michael Sanders and I represent BILTEC. Today we have two contentions. First, the trial court properly entered summary judgment in favor of BILTEC because BILTEC did not retain control over the incidental aspects of Chicago Town's work or Mr. Foley's work. Well, didn't Mr. Boeckert, he was asked at his deposition, did you retain control over the means and methods, and he said yes. The contractor did not retain control over the means and methods of the work, not in paragraph 1, paragraph 18, paragraph 25 of that contract, nor did he ever exercise himself any control to tell Mr. Foley to do his work in any particular way. Or did he tell anyone else? Whether he did or not, that doesn't mean he doesn't have supervisory control to do so. The question is not that he did, as we just heard, should he? I'm sorry? Should he have known? No, Your Honor. There is no evidence that he knew or should have known. Well, we know, but why not? He testified. He walks there every day, a couple times a day. He's looking, and there's the safety guy who's looking, and they have a responsibility for the site where the rebar is going to be, and they've testified how they're handled, they want to be safely, how they're stacked and where they're stored is part of their responsibility. Well, first of all, they testified. Everybody's testified that nobody's testified that they ever saw that this pile was in a tangled mess other than Mr. Foley on the 21st. Bocart testified, the safety superintendent, even Mr. Pablo and Mr. Ramirez, who are the gentlemen who actually stacked the rebar, nobody testified that this was a tangled mess. They all testified that they saw nothing wrong with this pile. Secondly, it was, in fact, Chicago Town's responsibility to handle and store the rebar. That's in paragraph 25 of the contract, and although it's true. Well, of course, that's why they were hired, wasn't it? I'm sorry? That's why they were hired. They left their job. They were hired to do the concrete work, and part of that's installing the rebar inside the concrete. Right, right. But part of the contract says, in paragraph 25, that they are responsible for the safe handling and storage of the rebar, just like in the snow. But that doesn't prohibit supervisory control and other provisions. And, as Justice Mason said, the testimony from Mr. Bocart indicates that he believed that the means and methods were part of his responsibility. Well, his responsibility, he could tell them to stop and do something, but that, again, was not part of the contract. And, again, that never happened in this case, and there was no reason to have that happen because nobody ever saw anything wrong with this stack of rebar until the 21st. Go ahead. I'm sorry. So Mr. Berman says, but that's the core of the question of fact. Nobody saw it. Should they have seen it? And that's what a jury has to decide. No, Your Honor. There still has to be some evidence in the record that this was, in fact, an entangled mess and it was enough time for the bill of tax and the employees to see it. Well, we have six days. We have testimony that it was like this for at least six days. Well, there's no testimony that it was like this for six days. Nobody has ever testified as to when it became an entangled mess. Well, we know it was moved six days before, and we know apparently nobody was there working on it, on this pile, until Mr. Foley went over there. But that doesn't mean it's not a real big construction project. Mr. Bocart is walking around, and other people are walking around and looking, and there is testimony from Mr. Foley that it's an entangled mess. That was Mr. Foley's testimony on the 21st. He was not on the job site back when this thing was moved or not. And, in fact, Mr. Caldwell and Mr. Ramirez, the two gentlemen, the laborers in Chicago town, who actually stacked the rebar near the brick wall, testified that it was – there was nothing unsafe about it, and they actually stacked it in such a way that it wouldn't be tangled. So we've got – I mean, we have nothing but speculation and conjecture that this had been in such a way. Well, maybe we have a question of faith. That's not a – you still – in order to get a question of fact, you still have to show that there is some sort of evidence that this had actually happened prior to then. It can't be speculation and conjecture. We came forth with testimony that said Bocart didn't know about it, the safety guys didn't know about it, they saw nothing wrong with this pile. But, again, that's not the question. Should they have known about it because it was there? There's no testimony about when it became there, when it became tangled, when it became a mess. Again, Mr. Pablo and Ms. Ramirez, who actually stacked it, said they stacked it fine, and it wasn't until the 21st that there was actually any notice or any sign that this was in a mess. And, in fact – Mr. Foley said that he didn't even notice that it was a tangled mess until he had moved about 20. Yeah. Yes, Your Honor. Thank you. I was going to point that out. He testified that he moved 20, and he testified that there was nothing that – he didn't think there was anything unsafe about what he was doing. He never called Mr. Bocart. He never called Mr. Chapman, his own boss. He never asked for additional ironworkers. And he himself didn't find anything unsafe about doing his work. And if he didn't think there was anything unsafe, on the 21st when it happened, that does not create a question that maybe it happened some previous time before. And, in fact, on the 21st, there's no evidence that Mr. Bocart was there at the site. There's no evidence – Mr. Foley testified he didn't see anyone from BILTEC. He didn't see anyone from Mr. Bocart on the site on that day. Well, there is testimony that he was there on a daily basis. Yes. That would include that day. It may have included that day, but remember, this occurred – His testimony was he was there on a daily basis. Right, but the incident occurred at 7.45. Mr. Foley began his work at 7.05. But Mr. Bocart said that he got there at 6 every day, didn't he? Right, but there's no testimony that he actually went and saw this at – Well, it was his direction that the rebar was moved from where it came off the truck to one place. And then he said, no, no, it's got to be moved. So it was his direction to move it. Well, it came off the site, and then, yes, they were going to do some work, and then they were going to move it. And it was his direction that it be moved. They believe it was. Mr. Chapman and Mr. Bocart weren't exactly sure, but they think that he was the one who approved it. Okay, it was Bill Peck's direction that Chicago Town move it someplace else. Because there was imminent – they were going to be building there and digging there. They needed to excavate so they could get the rebar out of the way. Yes, sir, but that does not retain, and according to the snow case from this point, that does not show that they retain any control into how it was to be stacked, where it was moved. Well, it was under his control how it was stacked when it first came off the truck. No, Your Honor, it was the responsibility of Chicago Town. In paragraph 25 of the contract, it was supposed to be the one, and, in fact, it was the one who took it off the truck. Okay, but he was responsible for making sure that it was stacked safely. No, Your Honor, that is under paragraph 25 of the Chicago Town contract. Well, what's a safety inspector for, then, if he's not supposed to inspect for safety? Why would any general contractor even have a safety inspector, then? Again, they have a responsibility to the owner to make sure generally that this is safe. Right, because you don't want your workers to get hurt, and you don't want lawsuits. Right, but according to our Supreme Court in Carnegie, according to this court in LePetre, according to this court in Snow, on safety, the general responsibility of being in control of these means and methods does not show control over the incidental aspects of the work. And, in fact, in those cases, even Carnick, for example, said that just touching on safety does not create control over the incidental aspects of the work. But we have more than that here. We have the testimony of Rippecus, we have the testimony of Bochar, and both of them are saying over and over again what their jobs are and their responsibilities on the site as well as safety. And Bochar said he would not allow a Chicago talent to store rebar in such a way that it's hazardous or causes material handling issues for the men. And he would have to follow his orders to correct that, even if it meant having them restore and reorganize the rebar, and so forth and so on. There's lots of testimony. And you keep going back to contract paragraph 26. Well, that's a general statement, 26. The question here is whether we have some specific information not only in the contract but in the testimony. And the question is it's not a high burden to do that. You have to have some question. So if there's some question, then that becomes a factual issue for the jury. No, Your Honor. And certainly none of that testimony ever says that they are going to tell Mr. Foley how he's going to put the rebar inside the footing or inside the form. And, in fact, there's no reason to do that. That's not the question. The question is, was it a tangled mess such that it's an issue at which they've Mr. Bokarch said, if it's a tangled mess, that's an issue. He testified to that. Right. Right? Right. He also testified that he didn't see anything wrong with it. Well, maybe he should have. The question is, he did. But the question is, should he have seen it? And that's a question of fact for the jury. No, Your Honor. There still needs to be some evidence of the record to create that question of fact. And there's nobody who's testified that they ever saw this, other than Mr. Foley, on the 21st, at or about 7 o'clock, between 7 and 745, other than Mr. Foley's testimony at that point. There's no testimony that anybody saw that to be a tangled mess at any time, and therefore, there cannot be any question about the reason. It's all purely speculation as to whether or not it suddenly became a tangled mess or when it became a tangled mess. If there's speculation about something, doesn't that automatically tell us there's a question of fact? No, Your Honor. This Court, in many cases, said on summary judgment, cannot be overcome by way of speculation or conjecture. We came forward with evidence to say there's no evidence that nobody ever saw this tangled mess any time before the 21st of May. It was the burden of the plaintiff to come forward with some evidence to say, well, yeah, as a matter of fact, there's evidence that it occurred on such and such a day. There is no evidence in this particular case. There is evidence it was a tangled mess. On the 21st, between 7 and 745 a.m. And there is evidence that Biltek's people on site were there at 6 o'clock in the morning. Right. And nobody, nobody, even Mr. Coley testified that they ever saw a boat bar in that area at any time. Never saw anybody come in to Biltek, and nobody from Biltek testified that they were there. I mean, that would say to me if Biltek said to Chicago Time the day before when the truck offloaded this rebar in the wrong place, and Biltek said to Chicago Time, move that stuff out of here, we've got to excavate, that the follow-up the next day or that afternoon or whenever the rebar was being moved would include making sure that it was being moved where they wanted it at the very least. Like put it someplace where it was going to be out of the way. They would at least have done that. And if they did that and it was a tangled mess, one could say, I think, oh, it's a tangled mess. So how did, what happened when they moved it? From the time it got taken off the truck in the wrong place and some boss said move that stuff to the time it got moved and stacked someplace else, are you telling me that it's not the general contractor's responsibility to make sure that it at least gets moved to the right place? Well, no, Your Honor. Actually, what happened in this case, it's just a matter of approval. You've got the right to approve. The testimony between Chapman and even Bogart is that they think they were the one, he was the one who chose the place over by the brick wall. He actually said, go over there. Okay. But even then. Well, what if Chicago Time moved it to a different place but it was a place that was also a bad place because that was going to be excavated in the afternoon? I mean, wouldn't the general contractor want to know that it was going to be moved to someplace out of the way where there wasn't going to be excavation for the next couple of days? Well, again, simply saying approving where it's going to go doesn't mean they have a responsibility to make sure it's stacked in the right way. And in this particular case, the testimony is, even from Mr. Foley on the 21st, at the top of this, he had no problem pulling these tiles off. When he got to the bottom of it, there was no problem. There's no way then so anybody could have seen that, and there's no testimony from anyone, no evidence from anyone, that simply taking a look at it to say, all right, it's by the brick wall or it's by this, would ever have told anybody that this was in a dangerous condition. And, in fact, again, the testimony is everybody saw it, even Mr. Poppel, Mr. Ramirez, Chapman, even the Chicago town employees said they never saw anything dangerous about this particular pile of rubble. And yet it was tangled fence. On the 21st between 7 and 745. And there is no evidence that there was any reason for anybody to have known at that time. Unless Your Honor has any questions, I'm happy to wrap up, unless anybody has any questions. Otherwise, the only other thing I would point out is that finding a duty in this situation, either by way of a duty under 414 would be contrary to both this Court's statements in the Petrie and Supreme Court statements in Carning, that it would be a disincentive to contractors to have such a receipt program to create liability in a situation just like this. We have a 20- to 30-year-old veteran fire worker, and the only control so far that has been shown is the safety program, that it's really a common sense idea of safety on how to place. But those are the reasons on that, and I'll briefly ask the Court to affirm these. Thank you. Thank you, Mr. Singers. Mr. Berman, briefly. Your Honor, there is actual testimony that that pile of rubble was in an unsafe condition prior to the day of the occurrence. And that was by? By the plaintiff. Well, he didn't deny that. He said on that day, it could have been a mess. He's just saying there was nothing to show at any time prior to that day it was in that condition. He's just saying that before he came to work, the condition, the pile of rebar that was placed that you were given to work on the day of the occurrence, that unsafe condition was already placed there before you started to work on it on the day of the occurrence, right? Yes. So before he started to try to look through. But he wasn't on site. His testimony is, I wasn't there before the 21st. So he doesn't have any personal knowledge to say what the condition of the stack was before he got there at 7 a.m. All he can do is say what it would look like the moment he arrived on the job site at 7 a.m. That's correct. But we also have testimony from Ramirez that the pile was not changed at all from the time that he moved it by hand there on May 15th to the day of the 21st. He specifically was asked the question, was the pile moved or changed in any way? He says no. No, but he also testified that he didn't do anything wrong. He certainly did testify he didn't do anything wrong, which I agree, again, is a question of fact. Because we have one person saying that pile is a tangled mess and it's unsafe, Mr. Foley himself. And we've got Mr. Ramirez who did the work of creating the tangled mess saying it wasn't a tangled mess and it wasn't unsafe. So that's a question of fact. And there's a dispute in the testimony right there. In fact, the plaintiff, the defendant argues again that they didn't see or did not see, did not actually see that the pile was a tangled mess. Well, that, again, goes to if they didn't see, should they have seen? And they can't say because I didn't notice it, because I'm closing my eyes, therefore, I have no duty to look. I would argue, Your Honors, that that's ultimately the ostrich defense. You know, put your head in the sand, don't pay any attention for safety, despite retaining the control, and turning around and saying on the job site as a general contractor, no, I'm just not going to do anything with regard to safety, despite promising. But he didn't say that, though. He said I walked the site every day. I was there at 6 a.m. that morning. He walked over the site. He didn't see anything unsafe. So, again, I don't understand how your position in this case doesn't make a general contractor, the insurer, strict liability for anything that happens on the job site. It's not strict liability because there's still a question of whether the defendant acted with reasonable care. That's any negligence case. I guess what I'm saying is if this evidence is enough to create a genuine issue of material fact on whether Biltech should have known, then every case goes to a jury. Every case goes because the plaintiff can always say, well, yeah, there's no evidence that anybody told you, but you should have known. Well, in any slip-and-fall case, there's evidence of constructive notice. What is constructive notice? That is a question of fact. Is 30 minutes a slippery condition? And there are summary judgments granted in slip-and-fall cases every day because the evidence of constructive notice is insufficient. Sometimes the evidence is insufficient. I agree with you. In this case, the evidence is not insufficient. In this case, six days of a pile of unsafe mess, tangled-up mess of rebar. Nobody says that. Nobody says that there was a tangled mess of rebar there for six days. I know you're arguing it. Right. But we have the people who stacked it saying it was stacked safely. We have Bochar, who was on the site, saying, I didn't notice anything unsafe. We have your client saying, I didn't notice anything until I had moved 20 pieces of rebar off, and then I came across this tangled mess. I don't see how that goes to a jury. That's not what the plaintiff said. He said that at the moment he arrived on the site, that tangled mess was present and unsafe. That's page C579, page 161 of his deposition, lines 6 through 12. There is evidence that that's what he said at that moment in time. Not after he dug around looking for all these tangled pieces of rebar. They shouldn't have had to be put in a position to do at all. The tangled mess was already there. Now, in this case, we have evidence that the pile of rebar wasn't changed for six days. It wasn't changed. Could a reasonable jury make the inference? I'm sorry. What page of Mr. Foley's deposition did you do? C579. I'm sorry. What's the page of the deposition? 161, lines 6 through 11. So in this case, certainly a reasonable jury could conclude that if the pile of rebar hasn't changed from May 15th to May 21st, and on May 21st, a morning of the occurrence, it's already in an unsafe tangled mess. Therefore, it was placed that way. Now, of course, the people who did it, Mr. Ramirez, denied it, denied creating a tangled mess in an unsafe condition. But, again, that's credibility issues. It's a question of fact. Mr. Ramirez and Mr. Powell are Mr. Foley's coworkers. They most certainly are his coworkers. That doesn't mean that they're not subject to the same credibility testing that any jury would do for any witness in a case. And certainly they can make that, you know, valued decision of whether, in fact, Mr. Ramirez created an unsafe condition that was present in an unchanged condition for six days that Mr. Bokar either saw, and I would argue actually saw in his testimony on pages 47 through, well, pages 757 to 759 of the record, in which he testified that, in fact, he saw the stockpile of rebar before it was moved. He said it had to be moved. He took a picture of it after it had been moved because he said that picture shows what it was, the condition was after it was moved. That picture, that same condition that he's well aware of, was the same condition of the rebar that Mr. Foley testified. That shows that tangled mess of rebar. That shows that unsafe condition. So clearly he was well aware of the unsafe conditions, and if he was exercising reasonable care, what would that mean? To supervise the work properly? To see that the conditions are unsafe? And just take some action. What is that action? Well, that's for the jury to determine. If he exercises a duty with ordinary care in the circumstances in this case by not ordering it to be repiled, restacked in an untangled fashion, again, that's for a jury to determine. BILTEC seems to be arguing that since BILTEC didn't personally take the rebar and throw him down in a tangled mess of a condition, that they can't be responsible for that conduct. Well, again, subcontractors are always responsible to physically do the work. General contractors are responsible to superintend the work and to supervise the work and to make sure that their subcontractors do the work safely. That's where the defendant failed in this case. That's what the evidence shows. Thank you, Your Honors. Thank you. Thank you both for your arguments here this morning and for your briefs. We will take the matter under advisement and recess briefly.